[Civ. No. 2317.  Fourth Appellate District.—August 9, 1939.]

C. I. T. CORPORATION (a Corporation), Appellant, v. JOHN H. HAWLEY, Respondent.

Clarence B. Smith for Appellant.

Childers & Roberts for Respondent.

GRIFFIN, J.—Appellant corporation is in the business of financing automobile dealers. Respondent was the Studebaker distributor in Imperial County. Appellant floored one sedan automobile and one automobile truck for respondent and accepted as to each a trust receipt and time draft which constituted the agreement of the parties as to each vehicle. Appellant filed this action in two counts to recover the unpaid balance of the amounts which respondent agreed to pay for the automobile and truck, according to the trust receipt-time draft transaction after respondent had placed the vehicles with a subdealer who had sold them and absconded with the proceeds. The case was tried before the court sitting without a jury, resulting in a judgment in favor of respondent. The judgment also allowed respondent a recovery against appellant on a cross-complaint for payments which respondent had made to appellant to apply on the purchase price of the cars in question after the subdealer had disposed of them. Judgment was duly entered. Appellant moved the court for a new trial, which motion was denied.

On July 6, 1936, the respondent signed a dealer's application for flooring plan accommodations. Thereafter respondent, as distributor for all of Imperial County, purchased Studebaker automobiles which were financed by appellant. On the 28th day of January, 1937, the above-named respondent executed and delivered to appellant wholesale documents consisting of a trust receipt and a time draft for the flooring of three Studebaker sedans, one of which was the sedan in question. The appellant caused the automobile described to be delivered to the respondent at El Centro. The time draft above mentioned was accepted by the respondent. The trust receipt-time draft instrument had the trust receipt printed on one side of the sheet and the time draft on the opposite side. Hawley, the respondent, had been in the habit of leaving automobiles which he had secured in the above-mentioned manner and which had been financed by the appellant in the same manner as above related, with various dealers in Imperial County for display and sale purposes. When appellant's car checker came to Imperial County twice each month, he went to nearly every town in Imperial County to find all of the cars which had been left with the respondent and floored for the respondent on the same terms and conditions as the above cars were left with him. Respondent furnished

all Studebaker dealers in Imperial County with all Studebaker cars and trucks sold by such dealers in Imperial County and he received a commission known as an "over-ride" from the Studebaker Corporation for all cars delivered to dealers in Imperial County. The evidence disclosed that if for any reason the dealers with whom Hawley had left the cars had not sold them, the cars so left for display purposes were often returned to the respondent Hawley. Appellant and respondent had no agreement as to where respondent Hawley should keep or store the cars which were financed by appellant. Since Hawley was a distributor and not a mere retail dealer, appellant did not object to his leaving cars with dealers throughout the county as stated. Between June 11, 1937, and July 2, 1937, appellant, through its agent, checked the automobiles which respondent Hawley was supposed to have in his possession and found the above-described sedan and the 1½-ton truck missing (the 1½-ton truck being the subject of appellant's second cause of action). Appellant made verbal and written demands on respondent immediately, demanding payment of $752.65 balance due on the Studebaker sedan above described and also demanded $752, the balance due on the 1½-ton truck. The 1½-ton truck was delivered to respondent on March 27, 1937. The respondent at the time of such delivery executed and delivered to appellant a trust receipt and time draft in the sum of $752 as consideration for the flooring of the truck, which time draft was accepted by the respondent.

The evidence disclosed that the respondent Hawley left the 1½-ton truck above described with a dealer at Calexico, Imperial County, California. This dealer, whose name was Quiros, is hereafter referred to as Calexico Motors. The evidence does not show the exact date when the truck was taken from El Centro to Calexico. Respondent Hawley does not contend that he ever asked permission of appellant corporation to take the truck to Calexico or to leave it with Calexico Motors.

The evidence disclosed that respondent Hawley, without the knowledge or consent of appellant, caused the truck to be left with the Calexico dealer with authority to said dealer to sell the truck and that the Calexico dealer disposed of the truck and did not pay either Hawley or appellant corporation, and now respondent's only defense to the second cause

of action pertaining to .the truck is that he claims that appellant knew that the truck was at Calexico Motors for several weeks before the Calexico dealer sold it and that appellant knew that the Calexico dealer made some alterations as to the frame of the truck and that therefore and thereafter respondent was completely relieved of the obligation created by the trust receipt-time draft transaction and that appellant was estopped from denying that it consented to the placing of the truck in the possession of Calexico Motors.

Respondent first claims that appellant's complaint sets forth only a cause of action for conversion; that when respondent established the fact that the property was placed in the hands of a third party with the consent and knowledge of the owner, he was no longer responsible to the owner. The complaint contains many averments essentially necessary to an action for conversion but the complaint also alleges the elements of contract, breach of contract, and damage. The appellant alleged: ''That the defendant signed a trust receipt for said automobile and to which there was attached a time draft which was accepted by said defendant. That attached hereto and marked Exhibit 'A' and by reference made a part hereof is a true copy of said trust receipt above mentioned and a true copy of the time draft attached thereto. . . . That plaintiff has made demand upon the defendant for said automobile or for the balance owing on the purchase price thereof. . . . That defendant has failed and neglected to pay the plaintiff the balance of the purchase price of said car, to-wit, $768.17, or any part thereof except that on June 23rd, 1937, the said defendant paid the plaintiff the sum of $38.17 to apply as part payment on said car, leaving a net balance of $730.00, which is now past due, owing, payable, and unpaid. . . . '' There is a similar allegation as to the second count of the complaint. Respondent apparently adopted the view that the action was upon the contract, as his pleadings are based on a theory beyond formal denial of conversion and contain allegations of matters by way of avoidance of the terms of the contract set up in appellant's complaint.

A closely parallel case is presented in *Cass* v. *Ocean Park Bath Co.*, 45 Cal. App. 656 [188 Pac. 616]. In that case the court, while observing that the complaint was bad for misjoinder of causes of action, pointed out that the defendant's remedy was by demurrer under section 430 of the Code of

Civil Procedure and that a failure to demur constituted a waiver of the objection under section 434 of the Code of Civil Procedure, and held that the defendant had breached the contract in failing, on demand, to redeliver the goods entrusted to his care and instructed the trial court to enter judgment in favor of the plaintiff. That case and the instant case proceeded to trial upon the issues joined by the complaint and answer without attack by demurrer. In this case the time draft and trust receipt were signed on the same day as part of the same transaction and preceded the delivery of the cars to the respondent.

Since the trust receipt came into common use as a device to facilitate the sales of automobiles, its nature has been widely discussed by the courts. The weight of opinion seems to be that a trust receipt and a time draft executed at the same time, together constitute a conditional sales contract. That view of the matter was adopted by our Appellate Court in *Commercial Acceptance Trust* v. *Bailey,* 87 Cal. App. 117 [261 Pac. 743]. It is apparent that the sole purpose of the two instruments, the trust receipt and the time draft, was to provide security for the payment to C. I. T. Corporation of the agreed purchase price of the vehicles delivered to Hawley. The function of the time draft is apparently to fix the time when the obligation should be paid. The sale price of each car is fixed in the trust receipt-time draft. The two instruments were unquestionably made parts of one transaction and should be considered together. Under this interpretation, the transaction was more than the ordinary trust agreement and the relationship was not that of trustor and trustee as ordinarily understood.

Respondent next contends that the contract resulting from the execution and delivery of the time draft and trust receipt to the appellant and the delivery of the cars to the respondent was rescinded by agreement and the court so found. Appellant claims that the evidence was wholly insufficient to support any such conclusion of law. The trial court found that "while said so-called trust receipt was in full force and effect and before any breach thereof, the plaintiff and the defendant entered into an oral agreement that the same be waived, abandoned and rescinded as to the automobile described . . . and that the same was then and there so mutually waived, abandoned and rescinded between the parties.

. . . That the plaintiff consented to the change in possession of the two automobiles referred to in the plaintiff's complaint and thus waived the terms of said trust receipt and is estopped to claim said automobiles or the proceeds thereof from the defendant."

As to the second count, it is agreed that the truck was delivered to respondent under the written trust receipt-time draft. Possession of the truck was given to Calexico Motors by respondent. The only evidence supporting respondent's contention and the court's finding that the parties entered into an oral agreement that the trust receipt-time draft was rescinded and waived for the reason that appellant was estopped from denying that possession of the truck was transferred to the Calexico Motors without its consent, was the fact of its knowledge of the possession being in the Calexico Motors when it was checked by the agent of appellant and he observed alterations being made thereon in the place of business of Calexico Motors. We are thoroughly convinced that this evidence falls short of supporting the finding that the parties mutually agreed that a rescission of the trust receipt-time draft was thereby effected. The mere knowledge of the presence of the truck at the Calexico Motors under the circumstances related would not operate as an estoppel as found by the court. The trust receipt-time draft did not preclude respondent from giving possession of the truck to any of his agents in Imperial Valley. Appellants at all times treated the truck as in the possession of respondent, as disclosed by their checking sheet record.

An estoppel may arise from silence as well as from words or conduct. But this is only where there is a duty to speak, and where the party upon whom such duty rests has an opportunity to speak, and, knowing that the circumstances require him to speak, remains silent. The circumstances attending the entire transaction must be such as to make it reasonably probable that the person seeking to set up the estoppel has suffered prejudice by the other's unreasonable acquiescence. There must be something wilful or culpable in the silence. (*Eltinge* v. *Santos,* 171 Cal. 278 [152 Pac. 915, Ann. Cas. 1917A, 1143] ; *Stern* v. *Sunset Road Oil Co.,* 47 Cal. App. 334 [190 Pac. 651] ; Code Civ. Proc., sec. 1962, subd. 3.) For the reasons expressed, the judgment as to the second count of necessity must be reversed.

■ The Studebaker sedan described in the first cause of action of appellant's complaint was originally delivered to respondent Hawley at El Centro. Hawley apparently had it on his floor at El Centro for several weeks and then permitted it to be left with the Calexico dealer, known as Calexico Motors, with authority to sell the same. The Calexico dealer sold the sedan and did not pay either Hawley or appellant corporation.

The only additional substantial fact that can be offered to support respondent's theory and the court's finding that a rescission of the trust receipt-time draft was effected must be based on a telephone conversation. The testimony of respondent Hawley in relation thereto was as follows: "Q. (By Mr. Childers.) That conversation was with Mr. Schrader, or whoever it was you talked to? A. I immediately called C. I. T. after having been requested to deliver the cars to Calexico by Mr. Jenkins and Mr. Schrader O.K.'d, or told me that I might deliver them to Mr. Jenkins to take to Calexico Motors. Q. Who is Mr. Jenkins? A. Mr. Jenkins was the Pacific Coast representative of the Studebaker Corporation. The Court: May I ask, did you say Mr. Schrader represented C. I. T.? A. C. I. T. The Court: He is the local representative of C. I. T.? A. Yes, sir. Q. Then what did you do? A. I called Mr. Jenkins back to Calexico and it happened that it hadn't been over ten or fifteen minutes, so I called him and told him C. I. T. had O.K.'d the removal of the cars. Q. What did you next do? A. I had to leave my business, place of business where the cars were and was gone for about two hours, and when I got back the cars had been taken. Mr. Jenkins had brought a couple of drivers up.''

During the cross-examination of Hawley he testified as follows: "Q. (By Mr. Smith): When you called Mr. Schrader, just what did you say to him and what did he say to you? A. Well, so far as the exact words are concerned, I couldn't repeat them, but I had been requested by Mr. Jenkins to let him take the cars to Calexico and I told Mr. Schrader about that request and Mr. Schrader granted the request. Q. Tell what you said in substance and what he said. A. That would be pretty hard to recall those exact words. I immediately called Mr. Jenkins back after talking to Mr. Schrader and told him the request had been granted by C. I. T. Q. Let's go back and get what was said by Mr. Schrader and what was

said by you. A. I haven't any copy of it, all I could give you is an idea of what he said. Q. Did you tell him Mr. Jenkins the Pacific Coast factory representative wanted to take cars to Calexico? A. That is right. Q. What did he say? A. He granted that request. Q. What did he say? A. I don't remember. Q. Is that all that was said, just a short conversation? A. Just a short conversation. Q. You didn't tell him that you were going to sell the cars to Calexico Motors. A. I did not. Q. Or did you tell him whether or not the cars would be returned to El Centro? A. I did not. Q. Did you tell him that he was out of cars down there and you wanted to let him take them for a few days? A. I don't think so. Mr. Jenkins may have given some reason for taking them down there and I might have told them the reason Mr. Jenkins wanted them. Q. You had, before that time, loaned them cars without selling them, to let them have to show in their show room? A. On the opening Mr. Jenkins made the same request. Q. On that occasion you just loaned them and brought them back? A. I think most of them were returned. I am pretty sure one sold down there and they paid C. I. T. for it.''

The testimony of Mr. Schrader, the agent for C. I. T. Corporation, regarding the telephone conversation was as follows: ''Q. (By Mr. Smith): Mr. Schrader, you are the El Centro manager of C. I. T.? A. Yes, sir. Q. And do you recall a telephone conversation with Mr. Hawley on or about the latter part of May, 1937, in which he asked something about Mr. Jenkins wanting a car to take to Calexico Motors? A. I do. . . . Q. What did he say to you and what did you say to him in that conversation? A. Hawley called up and asked for permission to take the cars down to Calexico Motors and he wanted to get my O. K. Q. What did you say? A. I said, 'If you are going to do that, Hawley, you should go ahead and change title to floor in the name of Calexico Motors like we handled it previously,' and he said, 'No, it is going to be down there for a few days, and in their storage, where and just as a loan, and it will be returned,' and I said, 'You do so at your own risk,' because, after all, it is floored in Mr. Hawley. So he took it down, and the next thing I knew, the cars were there. . . . Q. You have no agreement with him as to where he could store cars, did you? A. No, he could store them anywhere he wanted to.''

From this conversation as given by both Hawley and Schrader, it is quite apparent that Hawley never did say anything to Schrader which would lead Schrader or the C. I. T. Corporation to believe that Hawley expected to be relieved of the obligation of paying for or accounting for the truck and automobile.

One of appellant's witnesses testified on cross-examination, in reference to how Hawley handled similar transactions when sales were effected by one of his subdealers, as follows: ''Q. (By Mr. Smith): Explain now. A. Mr. Hawley, as distributor for Imperial County for passenger cars, would have his own stock of cars in his possession on which he had a flooring arrangement for them with C. I. T. If he wanted to sell a car to one of his subdealers he would call C. I. T. to find out if that subdealer had a line of credit with us and could agree to pay cash to him. The subdealer would come in and take possession of the car and the two of them, sometimes one of them separately, would come to our office and sign a trust receipt for the new dealer and Mr. Hawley would sign a bill of sale passing title, selling it for the full price to this dealer. . . . Q. That was never done with these two cars? A. It was never asked of us. He had done it on other occasions with the Calexico Motors, . . . ''

In addition to this, respondent offered in evidence an invoice in which he charged the sedan and the truck to the Calexico dealer. It reads in part as follows:

''VALENS OIL CO.
''Independently Owned by
J. H. HAWLEY. . .
''Sold to Calexico Motors. . . .
''1 St. Regis Sedan. . .$818.60
''FOR RESALE Delivered by
J. H. H. . . .''

Also dated ''6–24–1937'' and entitled as above:
''1 1-½ ton truck      $850.00
'' . . . FOR RESALE Delivered by JHH.''

By this invoice the intentions of respondent became quite apparent. If the two vehicles in question had been billed and an invoice sent by C. I. T. Corporation to the Calexico dealer, then there would be some force to respondent's argument

that C. I. T. Corporation had abandoned and waived its contract with him and had agreed to look to Calexico Motors for payment, but by the invoice mentioned, respondent personally billed the Calexico dealer with the two vehicles for money due Mr. Hawley. That act certainly was not consistent with his present argument that C. I. T. Corporation had waived and abandoned Hawley's written obligation. Appellant Hawley recognized his obligation to C. I. T. Corporation after the Calexico dealer had disposed of the sedan and the truck by making payments on these contracts to C. I. T. Corporation. There is no dispute that the payments were made several weeks after the cars had been taken to the Calexico dealer and even after they had been sold by the Calexico dealer and after he had absconded. Respondent never denied his obligations to appellant until after suit was filed.

It is claimed by respondent that the payments were made under threat of suit and the trial court allowed a recovery of the amount so paid. It is not legal duress to threaten to or actually take advantage of the usual remedy by suit for the enforcement of a debt or obligation. (*Holt* v. *Thomas,* 105 Cal. 273 [38 Pac. 891]; *Burke* v. *Gould,* 105 Cal. 277 [38 Pac. 733]; *Rooney* v. *Snow,* 131 Cal. 51 [63 Pac. 155].)

Hawley endeavored to collect for the two vehicles from the Calexico dealer after the Calexico dealer had sold them, but before he had absconded. We note in reading the transcript of the evidence that two Studebaker sedans were taken to the Calexico dealer on the day of the telephone conversation and that Hawley himself later went to Calexico and brought one of the sedans back to El Centro where he, Hawley, sold it. Respondent does not contend that there was any other act, written document, or oral conversation which relieved him of his responsibility except the telephone conversation mentioned. Assuming the correctness of the telephone conversation as represented by respondent, we are unable to accept the finding that this evidence sufficiently supported the ruling that the facts related amounted to a rescission, waiver and abandonment of the contract between appellant and respondent. Consent is not mutual, unless the parties all agree upon the same thing in the same sense. (Sec. 1580, Civ. Code.) From the foregoing, it is plain that there never was a meeting of the minds to abandon or rescind the obliga-

tions of respondent. (*Western Oil etc. Co.* v. *Sullivan,* 128 Cal. App. 319 [17 Pac. (2d) 156]; Civ. Code, secs. 1698, 1699; *Miller* v. *Steen,* 34 Cal. 138; *Hogan* v. *Anthony,* 52 Cal. App. 158 [198 Pac. 47]; *Sanborn* v. *Ballanfonte,* 98 Cal. App. 482 [277 Pac. 152].) The motion for a new trial should have been granted.

For the reasons expressed, the judgment is reversed.

Barnard, P. J., and Marks, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on September 15, 1939.